UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
NATHANIEL R. GRANT,
              Plaintiff,
v.

**OPINION AND ORDER**

SERGEANT HOGUE, Badge #193;
SERGEANT KERR, Badge #194; and
CORRECTION OFFICER BELAIR, Badge #1631,
              Defendants.

17 CV 3609 (VB)

--------------------------------------------------------------x

Briccetti, J.:

    Plaintiff Nathaniel R. Grant, proceeding in forma pauperis, brings this action under 42 U.S.C. § 1983, claiming defendants Sergeant ("Sgt.") Hogue, Sgt. Kerr, and Correction Officer ("C.O.") Belair violated plaintiff's constitutional rights by failing to protect him from an assault by another detainee at the Westchester County Jail ("WCJ").

    Before the Court is defendants' motion for summary judgment. (Doc. #75).

    For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

    The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

    The parties have submitted briefs, statements of material facts, declarations, and exhibits, which reflect the following factual background.

    Plaintiff was a pretrial detainee at WCJ at all relevant times. On November 23, 2016, he and nonparty inmate Juan Garcia were living in the same housing block. While plaintiff was in a hallway near Garcia's cell, C.O. Belair released Garcia from his cell so Garcia could make a phone call. Garcia charged at plaintiff and punched him in the head, leading to a fight in which plaintiff injured his wrist.

1

Plaintiff asserts that before this November 23 altercation, he and Garcia had two other encounters about which plaintiff complained to WCJ officials—the first a false accusation of sexual assault, and the second a dispute over Garcia's property. Plaintiff claims defendants failed to protect him from the November 23 assault by failing, after those two prior encounters, to issue a keep-separate order requiring that plaintiff and Garcia be kept apart at all times. Plaintiff also claims C.O. Belair failed to protect plaintiff from Garcia when C.O. Belair released Garcia from his cell on November 23.

> A. November 2015 Encounter

The first alleged encounter between plaintiff and Garcia occurred on November 19, 2015, after Garcia filed a written statement claiming another inmate had entered Garcia's cell at night and sexually assaulted him. Garcia's written statement did not implicate plaintiff. However, plaintiff claims he overheard Garcia accuse plaintiff of committing the assault. According to plaintiff, this "incident" between him and Garcia was not a physical confrontation, but rather "the allegation" Garcia made against plaintiff. (Doc. #87 ("Adams Decl.") Ex. 1 at 33). Plaintiff testified he did not "even know" Garcia before this occurred and "never met him until he made the allegation." (Id. at 25).

Plaintiff testified he was confined to his cell for an unspecified time on November 19, 2015, while jail officials investigated Garcia's report. The investigators concluded the report was false. (See Doc. #77 ("Chen Decl.") Ex. 3). Among other things, surveillance video revealed that no one had entered Garcia's cell during the time when Garcia claimed the assault occurred. Plaintiff testified that to his knowledge, no defendant helped investigate Garcia's report; but he expressed his "belie[f]" that defendants knew about it "[b]ecause all sergeants

speak to each other, that's something that's not going to stay a secret in the County Jail, something like that." (Adams Decl. Ex. 1 at 28).

### B. June 2016 Incident

The second incident between plaintiff and Garcia took place sometime between June 7 and June 10, 2016. Plaintiff and another inmate were assigned to clean Garcia's cell.[1] After they finished the job, Garcia accused plaintiff of stealing a book from Garcia's cell.

The parties dispute what happened next. According to plaintiff, Garcia approached plaintiff, assumed "a boxing stance" (Adams Decl. Ex. 1 at 49), and threatened to "fuck [plaintiff] up" (id. at 50). Plaintiff testified Garcia came to within "about three feet" of plaintiff and tried to instigate a fight by "jumping" and "pretending like [Garcia] was going to attack" plaintiff. (Id. at 48–50).

Sgt. Hogue observed the incident. At his deposition, Sgt. Hogue described it as an "argument" that he immediately diffused. (Adams Decl. Ex. 2 at 26). According to Sgt. Hogue, Garcia did not make any "threatening advances" toward plaintiff, and the incident did not require Sgt. Hogue's physical intervention. (Id. at 29).

The parties agree Sgt. Hogue directed plaintiff to ignore Garcia's provocation. Moments later, Sgt. Hogue and other officers intervened and separated Garcia from plaintiff. Garcia then tried to attack plaintiff through the group of responding officers, and the officers subdued Garcia and led him away. Plaintiff and Garcia did not come to blows or sustain any injuries.

Garcia was transferred to another housing block soon thereafter. A copy of Garcia's "booking summary report" dated January 25, 2017, does not indicate Garcia received any

---

[1] In 2015, plaintiff was named a "trustee" at WCJ—a privilege given to inmates deemed trustworthy. Among other things, trustees help clean the housing block and alert officers to potential conflicts or other noteworthy developments among inmates. As a trustee, plaintiff was permitted freely to leave his cell.

3

discipline for this incident. (See Adams. Decl. Ex. 5). Sgt. Hogue testified the "argument" was "resolved by Garcia being transferred off [of] the [housing] block" and thus did not warrant a keep-separate order. (Adams Decl. Ex. 2 at 38).

According to plaintiff, he asked Sgt. Hogue later that day to issue a keep-separate order as to plaintiff and Garcia. Plaintiff testified Sgt. Hogue responded by cursing at plaintiff, calling him a "Smart ass," and saying, "You a tough guy. You're a killer. I believe you can handle it."[2] (Adams Decl. Ex. 1 at 55). Plaintiff stated Sgt. Hogue then asked plaintiff if Garcia had hit plaintiff; plaintiff said no but stated, "I know that he doesn't have to hit me in order for you to put a Keep Separate on us." (Id.). Plaintiff testified he later asked Sgt. Hogue about the keep-separate order "a few times when he used to pass by." (Id. at 56). Plaintiff alleges Sgt. Hogue did not respond to these inquiries. Plaintiff otherwise does not recall ever speaking with Sgt. Hogue again.

Sgt. Hogue recalled his conversation with plaintiff differently. He testified plaintiff "mentioned something about put a keep separate [sic]"; that Sgt. Hogue responded in accordance with WCJ policy, by asking plaintiff whether he felt threatened or wanted to be placed in protective custody; and that plaintiff's "response was no." (Adams Decl. Ex. 2 at 30–31). Sgt. Hogue also testified plaintiff "said he didn't feel unsafe" (id. at 33); that plaintiff never told Sgt. Hogue about any prior incident between plaintiff and Garcia; and that plaintiff said only that he and Garcia "argue all the time" (id. at 30). Neither Sgt. Hogue nor any other official issued a keep-separate order as to plaintiff and Garcia after the June confrontation.

---

[2] Plaintiff was awaiting trial for second-degree murder.

4

C.     <u>Early November 2016 Events</u>

Approximately five months later, on November 1, 2016, Garcia was transferred back into plaintiff's housing block. Plaintiff testified that upon Garcia's return, plaintiff requested a keep-separate order from Sgt. Kerr in writing. According to plaintiff, Sgt. Kerr replied, "I'm going to take care of this, Grant. Don't worry about it. I'm going to make sure there is a Keep Separate on you." (Adams Decl. Ex. 1 at 73). Plaintiff testified Sgt. Kerr transferred Garcia back out of the housing block an hour or two later, but plaintiff later learned from another staff member that Sgt. Kerr never issued a keep-separate order.

For his part, Sgt. Kerr testified that plaintiff never gave Sgt. Kerr a written statement or asked to be placed in protective custody, and that Sgt. Kerr did not recall plaintiff ever asking for a keep-separate order.[3]

Three days later, on November 4, 2016, Garcia was again transferred back into plaintiff's housing block. From November 4 until the assault on November 23, Garcia and plaintiff coexisted without incident. Plaintiff testified he did not interact with Garcia at all in the ten days before the assault. Plaintiff acknowledged at his deposition that he did not request protective custody during this or any other time because he felt he "didn't have to. If [defendants] put the Keep Separate on me like they were supposed to . . . , why is there a reason to ask for me to be moved when I wasn't the problem on the block?" (Adams Decl. Ex. 1 at 69).

---

[3]     Plaintiff testified he submitted his written request to Sgt. Kerr at the direction of WCJ's warden, to whom plaintiff testified he described his prior encounters with Garcia. According to plaintiff, the warden responded by expressing surprise that a keep-separate order had not been issued as to plaintiff and Garcia, saying plaintiff and Garcia were "supposed to have a Keep Separate," promising to "do a full investigation," and promising plaintiff, "We're going to get it done." (Adams Decl. Ex. 1 at 72–73). The statements plaintiff attributes to the warden—whom plaintiff, represented by counsel, chose not to depose—are inadmissible hearsay. The Court therefore does not consider them for present purposes. See <u>Nora Bevs., Inc. v. Perrier Grp. of Am., Inc.</u>, 164 F.3d 736, 746 (2d Cir. 1998) (inadmissible evidence is not properly considered on a motion for summary judgment).

D.     November 23 Fight

On November 23, 2016, in the minutes before Garcia's assault, plaintiff was sitting in a hallway in the housing block, near an officer's station. Garcia called plaintiff over to Garcia's cell and asked if plaintiff had "a problem with" Garcia. (Adams Decl. Ex. 1 at 82). Plaintiff responded by pointing out that Garcia had recently stopped taking his medication and advising Garcia to resume taking it, because Garcia "always seem[ed] to want to target" plaintiff when Garcia went off his medication. (Id.). Garcia replied, "Well, maybe you right." (Id.). Plaintiff then returned to the officer's station, to which C.O. Belair was assigned at the time.

Plaintiff testified he then asked to speak with C.O. Belair and described to him plaintiff's prior run-ins with Garcia, alleged written request to Sgt. Kerr for a keep-separate order, and previous conversations about Garcia with other WCJ officials. According to plaintiff, he told C.O. Belair, "I've been lucky [Garcia] is staying in his cell but who's to say what happens if he comes out of his cell." (Adams Decl. Ex. 1 at 84).

C.O. Belair testified he could not recall whether plaintiff told C.O. Belair about plaintiff's prior run-ins with Garcia, and that C.O. Belair was not aware of any such encounters or that Garcia had confronted and tried to attack plaintiff in June 2016. According to C.O. Belair, he had no reason to think plaintiff might be in danger, and plaintiff never told C.O. Belair plaintiff felt threatened by or afraid of Garcia.

Several minutes after plaintiff's conversation with C.O. Belair, with plaintiff still near the officer's station, Garcia asked to be let out of his cell to make a phone call. Plaintiff testified his back was to Garcia's cell at the time, and that he did not say anything about Garcia's request because "[t]here was nothing more else to say [sic]" after plaintiff's conversation with C.O.

6

Belair. (Adams Decl. Ex. 1 at 87). However, according to C.O. Belair, plaintiff himself "asked [C.O. Belair] to let Inmate Garcia out" of his cell "for a phone call." (Id. Ex. 4 at 25).

C.O. Belair then remotely opened the door to Garcia's cell. Surveillance video of the housing block hallway shows Garcia emerge from his cell and walk down the hallway, presumably toward plaintiff and the officer's station, before suddenly lunging and swinging at plaintiff.[4] (See Adams Decl. Ex. 6). Plaintiff testified he punched Garcia back and then restrained him, injuring his wrist in the process. Officers quickly responded and ended the altercation.

### E. Policy Governing Keep-Separate Orders

Defendants submitted the affidavit of WCJ Warden Karl Vollmer. (See Chen Decl. Ex. 11). Warden Vollmer states the Westchester County Department of Correction ("DOC") did not implement an official written policy governing keep-separate orders until 2018. Instead, DOC left the decision whether to enter a keep-separate order "to the discretion of each individual supervisor." (Id. ¶ 6). According to Warden Vollmer, "[t]he general practice in 2016 was that 'keep separates' would only be ordered if two inmates got into a physical fight," and a "mere argument or dispute that did not result in any actual violence was not considered sufficient grounds to input a 'keep separate' order.'" (Id.). The record reflects that only sergeants and other supervisors, not correction officers, had authority to issue a keep-separate order.

---

[4] Defendants do not dispute that plaintiff is the individual seen being punched in the video.

## DISCUSSION

I. <u>Legal Standards</u>

    A. <u>Summary Judgment</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (citation omitted).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir. 2010) (quoting <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986)). It is the moving party's burden to establish the absence of any genuine issue of material fact. <u>Zalaski v. City of Bridgeport Police Dep't</u>, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322–23. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 252).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court may consider only evidence that would be admissible at trial. Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998) (citation omitted).

B. Failure to Protect a Pretrial Detainee

Failure-to-protect claims brought by pretrial detainees are analyzed under the Due Process Clause of the Fourteenth Amendment, rather than under the Eighth Amendment. This is because "[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'" Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (quoting Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007)).

A Fourteenth Amendment failure-to-protect claim arises when jail officials act "with deliberate indifference to the safety of the inmate." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614,

9

620 (2d Cir. 1996) (internal quotation and citation omitted). Such a claim must satisfy an objective prong and a mens rea prong. First, a plaintiff must prove "the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." Darnell v. Pineiro, 849 F.3d at 29. Second, a plaintiff must show that defendants acted with "at least deliberate indifference to the challenged conditions." Id.

To satisfy the objective prong, a plaintiff must show "that the conditions, either alone or in combination, pose[d] an unreasonable risk of serious damage to his health." Darnell v. Pineiro, 849 F.3d at 30 (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'" Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)). In the failure-to-protect context, "[a] substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by [a] plaintiff regarding the altercation or a request by [a] plaintiff to be separated from the attacker." Rennalls v. Alfredo, 2015 WL 5730332, at *4 (S.D.N.Y. Sept. 30, 2015) (third alteration in original) (citation omitted). However, such a previous altercation is sufficient, not necessary, to satisfy the objective prong. Blake v. Kelly, 2014 WL 4230889, at *5 (S.D.N.Y. Aug. 26, 2014) (citing Heisler v. Kralik, 981 F. Supp. 830, 837 (S.D.N.Y. 1997)). Courts also recognize that "[v]erbal threats alone do not violate the Fourteenth Amendment 'unless accompanied by physical force or the present ability to effectuate the threat.'" McDonald v. Smith, 2013 WL 7044723, at *9 (W.D.N.Y. Dec. 17, 2013) (quoting Jermosen v. Coughlin, 878 F. Supp. 444, 449 (N.D.N.Y. 1995); Harris v. Lord, 957 F. Supp. 471, 475 (S.D.N.Y. 1997)). The ultimate inquiry remains whether the plaintiff has shown that a substantial risk of serious harm "actually existed and was

10

imminent." See Douglas v. Annuci, 2017 WL 5159194, at *4–5 (W.D.N.Y. Nov. 7, 2017) (collecting cases).

The Fourteenth Amendment's mens rea prong "is defined objectively." Darnell v. Pineiro, 849 F.3d at 35. To satisfy it, a "pretrial detainee must prove that the defendant-official acted intentionally . . . or recklessly failed to act with reasonable care to mitigate the risk [of harm] . . . even though the defendant-official knew, or should have known," of the risk. Id. Thus, unlike the Eighth Amendment, the Fourteenth Amendment "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

### C. Qualified Immunity

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Defendants bear the burden of establishing qualified immunity." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (internal citation omitted).

"The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established;' and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013) (quoting Taravella v. Town of Wolcott, 599 F.3d 129, 133–34 (2d Cir. 2010)).

"Dismissal on the basis of a qualified immunity defense is not appropriate" when "there are facts in dispute that are material to a determination of reasonableness." Rosen v. City of New York, 667 F. Supp. 2d 355, 362 (S.D.N.Y. 2009) (citing Thomas v. Roach, 165 F.3d 137, 143–45 (2d Cir. 1999); Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995)).

II. Application

The Court first addresses the claim against C.O. Belair, and then addresses the claim against Sgt. Hogue and Sgt. Kerr.

A. C.O. Belair

C.O. Belair argues no reasonable juror could find that plaintiff satisfies the mens rea prong.

The Court agrees.

Plaintiff indisputably did not have a keep-separate order as to Garcia when C.O. Belair let Garcia out of his cell on November 23, 2016. Moreover, as a non-supervisor, C.O. Belair undisputedly lacked authority to issue one. Accordingly, the summary judgment record reflects that C.O. Belair's decision to release Garcia from his cell complied with WCJ policy, and that C.O. Belair neither knew nor had reason to know Garcia posed a risk to plaintiff's safety.

The only evidence arguably to the contrary is plaintiff's testimony—which the Court must accept as true for purposes of this motion—that plaintiff described his prior conflicts with Garcia to C.O. Belair shortly before C.O. Belair released Garcia from his cell. However, no reasonable juror could conclude, on that basis alone, that C.O. Belair's decision to release Garcia from his cell was intentional or reckless. Indeed, the lack of a keep-separate order (or any other administrative action requiring plaintiff and Garcia to be kept apart) signaled that Garcia's request to exit his cell for a phone call could be safely granted. Absent anything more, plaintiff's

expression of his own personal belief that WCJ supervisors should have issued a keep-separate order, after prior incidents with Garcia of which C.O. Belair had no personal knowledge, does not suffice to place C.O. Belair's mens rea in genuine factual dispute.

Thus, as a matter of law, C.O. Belair did not act intentionally or recklessly by letting Garcia out of his cell. The Court therefore grants C.O. Belair's motion for summary judgment.

B.      Sgt. Hogue and Sgt. Kerr

Sgt. Hogue and Sgt. Kerr argue plaintiff fails to satisfy the objective and mens rea prongs as a matter of law, and that they are entitled to summary judgment on grounds of qualified immunity.

The Court disagrees.

First, a reasonable juror could conclude plaintiff satisfies the objective prong. On plaintiff's account of the June 2016 incident, Garcia came within a few feet of plaintiff, assumed a fighting stance, attempted to provoke plaintiff by pretending to lunge at him several times, and then tried to force his way through several responding officers in an effort to physically attack plaintiff. Plaintiff claims he then reported the incident to Sgt. Hogue and Sgt. Kerr and, citing concern for his safety, asked both of them to issue a keep-separate order.

Plaintiff's testimony arguably describes "a previous altercation" with Garcia "coupled with a complaint by plaintiff" to prison officials or a "request . . . to be separated from the attacker." Rennalls v. Alfredo, 2015 WL 5730332, at *4. Plaintiff also arguably attributes to Garcia more than "[v]erbal threats alone," McDonald v. Smith, 2013 WL 7044723, at *6; he says Garcia came within three feet of plaintiff in a fighting stance and then tried to attack plaintiff through a group of correction officers. A reasonable juror crediting plaintiff's testimony

13

could therefore conclude that after the June 2016 conflict, Garcia presented an actual, imminent, and substantial risk of serious harm to plaintiff's safety.

Second, genuine issues of material fact likewise preclude summary judgment as to the mens rea prong. According to plaintiff, he asked Sgt. Hogue to issue a keep-separate order shortly after the June 2016 incident. In response, plaintiff claims Sgt. Hogue called plaintiff a "Smart ass," "a tough guy" and "a killer"—apparently referring to plaintiff's pending murder charge—and said he "believe[d] [plaintiff] could handle" Garcia on plaintiff's own. (Adams Decl. Ex. 1 at 55). Assuming, as the Court must on summary judgment, that plaintiff accurately described this interaction, a reasonable juror could conclude Sgt. Hogue intentionally or recklessly disregarded a serious risk to plaintiff's safety when Sgt. Hogue denied plaintiff's request for a keep-separate order.

As for Sgt. Kerr, plaintiff claims he gave Sgt. Kerr a written statement requesting a keep-separate order after the June 2016 incident. According to plaintiff, Sgt. Kerr responded by saying, "I'm going to take care of this, Grant. Don't worry about it. I'm going to make sure there is a Keep Separate on you." (Adams Decl. Ex. 1 at 73). Plaintiff testified that despite this alleged statement, Sgt. Kerr failed to issue a keep-separate order but did immediately transfer Garcia to another housing block, suggesting Sgt. Kerr may have perceived a threat to plaintiff's safety. Assuming—as the Court must at this procedural stage—that Sgt. Kerr did in fact make this statement recognizing plaintiff's need for a keep-separate order, a reasonable juror could conclude Sgt. Kerr's failure to issue one was reckless or intentional.

Third, the Court cannot conclude at this stage of the case that qualified immunity shields Sgt. Hogue and Sgt. Kerr from plaintiff's claims. Plaintiff's right to defendants' protection from inmate violence was clearly established when the events giving rise to this case occurred. See,

14

e.g., Morales v. Seltzer, 300 F. App'x 92, 93 (2d Cir. 2008) (summary order) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994); Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000)). And the material factual disputes outlined above—namely, whether Garcia posed an unreasonable and serious risk to plaintiff's safety after the June 2016 incident, and whether Sgt. Hogue and Sgt. Kerr told plaintiff they would issue a keep-separate order—bear on the objective reasonableness of Sgt. Hogue and Sgt. Kerr's conduct. Accordingly, Sgt. Hogue and Sgt. Kerr are not entitled to qualified immunity at this time. See Rosen v. City of New York, 667 F. Supp. 2d at 362 (citations omitted).

For all these reasons, the Court denies summary judgment as to Sgt. Hogue and Sgt. Kerr.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The Court awards summary judgment in C.O. Belair's favor. However, plaintiff's claims against Sgt. Hogue and Sgt. Kerr shall proceed.

The Court will hold a case management conference on August 29, 2019, at 9:30 a.m., at which the Court will set a trial date and schedule pretrial submissions.

By August 15, 2019, the parties shall submit a joint pretrial order in accordance with the Court's Individual Practices, Paragraph 3.A.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate the motion (Doc. #75) and terminate defendant C.O. Belair.

Dated: July 12, 2019
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge